**COURT OF APPEALS
DECISION
DATED AND FILED**

**February 12, 2025**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP2078-FT**

Cir. Ct. No. 2015ME143

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT II**

IN THE MATTER OF THE MENTAL COMMITMENT OF C.D.B.:

RACINE COUNTY,

PETITIONER-RESPONDENT,

V.

C.D.B.,

RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Racine County: WYNNE P. LAUFENBERG, Judge. *Affirmed*.

¶1   GUNDRUM, P.J.[1] C.D.B., referred to herein by the pseudonym "Calvin Banks," appeals from an order extending his involuntary commitment under WIS. STAT. ch. 51 and a related order allowing for the involuntary administration of medication and treatment.[2]   Banks contends Racine County (County) failed to present sufficient evidence in support of the orders and the circuit court erred when it permitted the case manager to testify over Banks' hearsay objection.  For the following reasons, we affirm.

### Background

¶2   In November 2015, Banks was emergently detained after he fled from police while operating a stolen vehicle.  *Racine County v. C.B.*, No. 2023AP2018-FT, unpublished slip op. ¶2 (Mar. 20, 2024).  He was committed under WIS. STAT. ch. 51 for six months at Winnebago Mental Health Institute, and he has been under continuous ch. 51 commitment since.  On April 2, 2024, the County filed a petition to again extend his commitment and seek another involuntary medication and treatment order.  The circuit court held a hearing on the petition on May 17, 2024, at which the following relevant evidence was presented.

---

[1]   This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2]   On March 20, 2024, this court issued an opinion affirming the circuit court's May 9, 2023 involuntary recommitment and medication orders related to Banks.  *See Racine County v. C.B.*, No. 2023AP2018-FT, unpublished slip op. (Mar. 20, 2024).  While this court gives individual consideration in this opinion to the circuit court's May 17, 2024 involuntary recommitment and medication orders, because historical facts remain unchanged and much of the procedural posture of this appeal mirrors that of the prior appeal, we utilize herein some of the same language from the March 20, 2024 opinion.

¶3      Psychologist Dr. William Bjerregaard testified that he had performed an in-person recommitment evaluation of Banks on April 29, 2024, and prepared a related report that same day, which report was submitted as evidence at the final hearing.  Bjerregaard had examined Banks at least three times before, related to prior recommitments.  *C.B.*, No. 2023AP2018-FT, ¶3.

¶4      Bjerregaard testified that Banks is "on three different antipsychotic medications":  "Invega Hafyere," "Risperidone and Quetiapine [Seroquel]."[3] When asked about discussing with Banks "the circumstances that led to the original commitment," Bjerregaard responded that Banks "recalls being accused of speeding and driving into oncoming traffic in a car that he had stolen.  And that the police fought him and beat him up, brought [him] to the [emergency room (ER)] and then to jail."  Banks further told Bjerregaard that "he thought he could elude them, so he sped up and tried to elude the police and hide from them."  In his April 29, 2024 report, Bjerregaard wrote that Banks stated, "I did run from the police but they caught me [and] handcuffed me [and] then beat me up with my hands behind my back.  They brought me to the ER [and eventually to] jail."

¶5      Bjerregaard testified that Banks has "been hospitalized at least twice at Mendota and four times at Winnebago State Hospital.  Although he has been hospitalized for a number of years now and he's been under court-ordered medication."  Banks had previously informed Bjerregaard that he "spent four years in prison in the early 1990's."

---

[3] Bjerregaard's April 29, 2024 report identifies the third medication as Seroquel. Seroquel is a brand name of quetiapine.  *See* DRUGS.COM, https://www.drugs.com/quetiapine.html (last updated Aug. 22, 2023).

¶6 Bjerregaard testified that Banks suffers from chronic paranoid schizophrenia, "demonstrated with his thought disorder and grandiose delusions" that involve "him having many college degrees from many different universities and having a large sum of money, more than he needs, so that he can buy whatever he wants." While Banks complies with the medication order, Bjerregaard stated that Banks "has no intention of continuing medication if he's not under a court order for medication." Medication has therapeutic value for Banks as he has "maintained himself outside the hospital under the current court order," Bjerregaard explained, adding his hope that Banks "can develop some insight into why he's receiving treatment." Bjerregaard noted that Banks' "only complaint with the medication is that it's painful when he gets the [Invega Hafyere] injection and that's every six months."

¶7 Bjerregaard confirmed that he explained to Banks "the advantages, disadvantages, and alternatives to the recommended medication," noting that while Banks is "able to discuss the medication and its uses with me," he "has no insight and would hope to stop the medication as soon as possible." More specifically, Bjerregaard noted in his report that he explained to Banks the advantages to the recommended medication, specifically that they "[d]ecrease fears, anxiety, [and] confusion," the disadvantages, specifically that they can cause "[s]edation, weight gain, movement disorder," and alternatives, specifically "[o]ther antipsychotics." Bjerregaard agreed that Banks' inability to apply an understanding of the medications to his own situation was because of his mental illness. In his report, Bjerregaard wrote that Banks denied having schizophrenia and stated, "I have nothing wrong with me and don't need any medicine."

¶8 As to Banks' dangerousness, Bjerregaard also wrote in his report, "Dangerous driving[,] eluding police [and] travelling at high speeds[,] possibly

into oncoming traffic when off medicine—now hopes to stop medicine ASAP which would place him at risk for again engaging in dangerous behavior." He wrote that Banks' "[h]istory of dangerous driving"[4] supported his opinion that Banks evidenced a "substantial probability" of physical harm to himself and/or other persons.

¶9 Bjerregaard testified that Banks "is very vague and superficial in providing information. He also is rather paranoid about the police, believing that they're monitoring him regularly." Banks is "vague and also somewhat disjointed in terms of how his thought processing develops." Banks "has essentially no insight into having a mental illness and because of that, his judgment is impaired." Bjerregaard agreed that Banks "would be a proper subject for commitment if his treatment were withdrawn

¶10 Bjerregaard testified that Banks "is dangerous to others." Expounding, Bjerregaard stated,

> [I]f he stops his medication, I believe he will become more disorganized in his thinking and engage in dangerous behavior again. Possibly stealing another car, since he seems to have an interest in taking cars. And if he drives recklessly, he's impairing not only himself but other people in the community.

Bjerregaard agreed "there's a substantial probability of physical harm to [Banks] himself and to others."

---

[4] In *C.B.*, No. 2023AP2018-FT, ¶14, we noted that at the final hearing related to that recommitment, Banks' case manager since 2015, Angela Townsend, testified that Banks had "tak[en] and driv[en] cars without permission" and agreed that such had happened "on at least three occasions." The same circuit court judge presided over the final hearing related to the March 20, 2024 orders.

¶11     Bjerregaard agreed Banks is "a proper subject for treatment" and recommended "[o]ngoing antipsychotic medication … and attempts to educate [Banks] regarding his … having a mental illness and its features, such as his grandiosity."   Bjerregaard stated that there have been "ongoing attempts [to educate Banks in this manner], but his lack of insight is very resistant to any intervention."   When asked if Banks had "express[ed] any interest in any treatment," Bjerregaard responded, "Not really, since he says he has no mental illness and there's no reason for him receiving any treatment."

¶12     On cross-examination, Bjerregaard agreed Banks had displayed no incidents of dangerousness since his commitment began but added that this was "[b]ecause he's under court-ordered medication."

¶13     Angela Townsend, Banks' case manager, testified, following a hearsay objection by Banks' counsel that was overruled by the circuit court, that approximately ten years earlier Banks "had stolen [a] vehicle and when police tried to stop him, he drove into oncoming traffic."   She further testified that during a conversation with Banks in January 2024, he "denied having a mental illness and said that medications weren't helpful because he didn't have a mental illness.  And that if the order was to end, he would no longer take medications."   She agreed this has been his position "since 2015."   Townsend opined that if Banks failed to take his medication, it "would result in him becoming symptomatic, which would most likely result in him engaging in behaviors that put himself and the community at risk."

¶14     On cross-examination, Townsend acknowledged that Banks told her that even if he was not recommitted, he would nonetheless meet with his case

manager. She further acknowledged that Banks has not had any incidents of dangerousness since the driving incident in 2014.

¶15 The circuit court found that "clearly the medications assist [Banks] in being able to maintain in the community … and not engage in the extremely dangerous activity that he was arrested for back in 2014, 15, where he stole a vehicle, fled police, and was driving into oncoming traffic." The court stated that "the entire … community [is put] at risk that's in or around the area where the fleeing car is" and noted that Banks is "still aware of that behavior," pointing out that "[h]e's recently, at the evaluation, discussed it with Dr. Bjerregaard again." The court pointed out that Bjerregaard and Townsend are concerned "that if [Banks] does not stay on the medications, that type of extremely dangerous criminal activity will and could occur again because he will decompensate." The court was "convinced … that based on [Banks'] consistent position, as expressed to his case manager, as expressed to Dr. Bjerregaard, that he does not have a mental health disorder[, Banks] will not take medications if there's not a court order." The court found that due to his mental illness, Banks "lacks the insight … to fully appreciate and be able to apply an understanding of the advantages and disadvantages of medication for his diagnoses. Again, because his position is, [']I don't need medications.[']" The court noted that it was "the procedural history" that Banks was "charged" in relation to his 2014 driving incident, he "entered a not guilty by reason of mental disease or defect [plea] in those criminal proceedings," and the matter was ultimately converted to this WIS. STAT. ch. 51 commitment. The court found, based on the 2014 driving incident, that there was clear and convincing evidence that if his treatment were withdrawn, Banks "would be a danger to himself and others."

¶16 The circuit court entered orders extending Banks' involuntary commitment and involuntary medication and treatment, and Banks appeals.

## Discussion

¶17 An individual is a proper subject for recommitment under WIS. STAT. § 51.20(1) if the County proves by clear and convincing evidence that the individual is mentally ill, a proper subject for treatment, and dangerous. *See Langlade County v. D.J.W.*, 2020 WI 41, ¶31, 391 Wis. 2d 231, 942 N.W.2d 277; § 51.20(13)(e). Banks does not dispute he is mentally ill and a proper subject for treatment. He insists, however, the court erred in concluding the County met its burden to prove he is dangerous. We do not disturb a circuit court's findings of fact "unless they are clearly erroneous," and we accept all reasonable inferences from those facts. *Outagamie County v. Melanie L.*, 2013 WI 67, ¶38, 349 Wis. 2d 148, 833 N.W.2d 607. We review de novo, however, whether the statutory standard of dangerous has been met. *D.J.W.*, 391 Wis. 2d 231, ¶47 ("A determination of dangerousness is not a factual determination, but a legal one based on underlying facts.").

¶18 Banks also claims the circuit court erred in concluding the County met its burden under WIS. STAT. § 51.61(1)(g)4.b. to prove by clear and convincing evidence that he is incompetent to refuse medication. *See* WIS. STAT. § 51.20(13)(e). "In evaluating whether the County met its burden of proof, a court must apply facts to the statutory standard in ... § 51.61(1)(g)4.b. and interpret the statute. Applying facts to the standard and interpreting the statute are questions of law that this court reviews independently." *Melanie L.*, 349 Wis. 2d 148, ¶39.

¶19 Lastly, Banks claims the circuit court erred when it permitted case manager Townsend to testify over Banks' hearsay objection. We will uphold a

8

circuit court's evidentiary ruling unless it erroneously exercised its discretion. *State v. Reinwand*, 2019 WI 25, ¶17, 385 Wis. 2d 700, 924 N.W.2d 184.

Recommitment Order

¶20　Banks first asserts the County failed to prove a substantial likelihood he would "become dangerous" if treatment were withdrawn. He so claims because the County provided "no direct witnesses" to his conduct of engaging in a high speed chase with police in 2014. We are unmoved, as according to Bjerregaard's accepted testimony, Banks himself admitted to the conduct, telling Bjerregaard he "thought he could elude them, so he sped up and tried to elude the police and hide from them." And Bjerregaard noted in his report that Banks told him, "I did run from the police but they caught me [and] handcuffed me," eventually taking him to jail. Further related to Banks' dangerousness, Bjerregaard also wrote in his report, "Dangerous driving eluding police [and] travelling at high speeds possibly into oncoming traffic when off medicine—now hopes to stop medicine ASAP which would place him at risk for again engaging in dangerous behavior." Bjerregaard also noted that Banks is "paranoid about the police." Bjerregaard testified that Banks "is dangerous to others," expounding that "if he stops his medication, … he will become more disorganized in his thinking and engage in dangerous behavior again" and agreed "there's a substantial probability of physical harm to [Banks] himself and to others." Moreover, we note the following from our March 20, 2024 opinion related to Banks' last recommitment:

> [T]he [circuit] court made clear that the substantial probability of harm to Banks himself and others was Banks' "extremely dangerous" precommitment conduct of "[d]riving a vehicle, fleeing from police" that "puts not only [Banks] in danger but also everybody in the community that happens to be on the road in the area where

> somebody is fleeing." *Engaging in a high speed chase with police is unquestionably dangerous conduct that places Banks and others in danger.*

***C.B.***, No. 2023AP2018-FT, ¶22 (third and fourth alterations in original; emphasis added). Thus, we have already determined that Banks' 2014 conduct—the very conduct underpinning the current recommitment; conduct which is historical and incapable of changing—was "unquestionably dangerous."[5] Banks' questioning as to whether the 2014 high speed chase with police incident was dangerous goes nowhere.

¶21    Banks also suggests the circuit court's order for recommitment is wanting because there is no "proof of dangerousness before or after that single act of criminal misconduct." But, Banks points to no law and develops no legal argument supporting his suggestion that the recommitment order is infirm because there are purportedly no subsequent acts of dangerousness. Indeed, as thoroughly recognized by our statutes and case law, WIS. STAT. § 51.20(1)(am) takes into account that a committee may not have exhibited dangerousness since receiving medication under commitment specifically because the commitment and medication orders are working. *See **Portage County v. J.W.K.***, 2019 WI 54, ¶19, 386 Wis. 2d 672, 927 N.W.2d 509 ("[Paragraph 51.20(1)(am)] recognizes that an individual receiving treatment may not have exhibited any recent overt acts or omissions demonstrating dangerousness because the treatment ameliorated such behavior, but if treatment were withdrawn, there may be a substantial likelihood

---

[5] We further noted in our March 20, 2024 opinion that "at Banks' prior recommitment hearing, held one year earlier and with the same judge presiding, Banks stipulated to his recommitment—which necessarily means he stipulated to his dangerousness—and the circuit court determined Banks dangerous pursuant to WIS. STAT. § 51.20(1)(a)2.b., concluding he evidenced "a substantial probability of physical harm to other individuals." ***C.B.***, No. 2023AP2018-FT, ¶24 n.7.

such behavior would recur.").  That is precisely what Bjerregaard testified to in this case, agreeing that Banks had displayed no incidents of dangerousness since his commitment began but adding "[b]ecause he's under court-ordered medication."

¶22  Lastly, Banks asserts the recommitment order is founded on "speculative inferences."  For example, he calls it speculation that Banks "would *probably* cease taking his medication" if his commitment lapsed and would then "*potentially* decompensate."  The evidence provided the circuit court much more certainty on these points.

¶23  Both Bjerregaard and Townsend testified to near certainty that Banks would "cease taking his medication" if the commitment was not extended. Bjerregaard stated that Banks "has no intention of continuing medication if he's not under a court order for medication," "hope[d] to stop the medication as soon as possible," and unambiguously expressed his firm belief that he has no mental illness and relatedly stated, "I don't need any medicine."  And Townsend stated Banks "said that medications weren't helpful because he didn't have a mental illness" and "if the order was to end, he would no longer take medications."  She agreed that this has been his position "since 2015."

¶24  As to the likelihood of decompensation, Bjerregaard testified that Banks has been able to "maintain[] himself outside the hospital" and has not done anything dangerous since the original incident in 2014 "[*b*]*ecause* he's under court-ordered medication."  (Emphasis added.)  Bjerregaard stated that "if [Banks] stops his medication," he "*will become* more disorganized in his thinking and engage in dangerous behavior again" and relatedly agreed "there's a substantial probability of physical harm to himself and to others."  (Emphasis added.)

Townsend also testified that if Banks failed to take his medication, it "would result in him becoming symptomatic, which would most likely result in him engaging in behaviors that put himself and the community at risk."[6]

> ¶25 As we have stated, neither WIS. STAT. § 51.20(1)(a) nor case law
>
> > requires an expert or circuit court to speculate on the precise course of an individual's impending decompensation by identifying specific *future* dangerous acts or omissions the individual might theoretically undertake without treatment…. Dangerousness in an extension proceeding can and often must be based on the individual's precommitment behavior, coupled with an expert's informed opinions and predictions.

*Winnebago County v. S.H.*, 2020 WI App 46, ¶13, 393 Wis. 2d 511, 947 N.W.2d 761. The circuit court relied on far more than "speculative inferences." The evidence before the court firmly supports its finding that if the commitment and medication and treatment orders are not extended, Banks would cease taking the necessary medications, creating a substantial probability he would decompensate and again engage in dangerous conduct.

Medication Order

¶26 Banks additionally contends the evidence presented at the hearing was insufficient to support the involuntary medication order under WIS. STAT. § 51.61(1)(g)4. because he did not receive from Bjerregaard a "sufficient" or "reasonable" "explanation of the advantages, disadvantages, and alternatives to psychotropic medication." We conclude the County provided sufficient evidence in support of the medication order.

---

[6] While Banks' counsel objected to this testimony on grounds of "[s]peculation," the circuit court overruled that objection, and Banks does not challenge that ruling on appeal.

¶27 "[U]nder WIS. STAT. § 51.61, a person has the right to refuse medication unless a court determines that the person is incompetent to make such a decision." *Melanie L.*, 349 Wis. 2d 148, ¶53. As relevant to this case, the County establishes a person's incompetency to refuse medication by proving by clear and convincing evidence that due to mental illness

> and after the advantages and disadvantages of and alternatives to accepting the particular medication ... have been explained to the individual, …:
>
> ….
>
> b. The individual is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his ... mental illness ... in order to make an informed choice as to whether to accept or refuse medication or treatment.

*See* § 51.61(1)(g)3., 4.; WIS. STAT. § 51.20(13)(e). Banks claims the evidence was insufficient to support the medication order because Bjerregaard failed to identify in his testimony "a specific medication" and because the evidence did not provide "explanatory detail as to *what* side effects, *what* alternatives, and *when* and *how* that conversation [between Banks and Bjerregaard] had occurred." Banks' claims fail.

¶28 As to not identifying "a specific medication," Banks apparently missed where Bjerregaard explained in his testimony that Banks is "on three different antipsychotic medications. One is an injectable, Invega Hafyere, that he gets every six months. Then he's on two oral antipsychotics, Risperidone and [Seroquel]."

¶29 As to "explanatory detail" on "side effects," "alternatives" and "when and how the conversation had occurred," we look to the requirements of the statute, not the stricter bar Banks would like to impose. The statute allows for a

medication order if "after the advantages and disadvantages of and alternatives to accepting the particular medication … have been explained to the individual … [t]he individual is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his ... mental illness ... in order to make an informed choice as to whether to accept or refuse medication or treatment." *See* WIS. STAT. § 51.61(1)(g)4. The circuit court here found by clear and convincing evidence that Bjerregaard had explained the advantages, disadvantages and alternatives to Banks and that due to his mental illness, Banks was substantially incapable of applying an understanding of the same to his mental illness so as to be able to make an informed choice on accepting or refusing medication. The evidence supports these findings.

¶30    In his report, Bjerregaard identified that he "explain[ed] [to Banks] the advantages, disadvantages, and alternatives to the recommended medication." Bjerregaard handwrote that he "explained" that the advantages were "[d]ecrease[d] fears, anxiety, [and] confusion," the disadvantages were "[s]edation, weight gain, [and] movement disorder," and the alternatives were "[o]ther antipsychotics." As to an additional disadvantage of which Banks was obviously aware, Bjerregaard testified that Banks' "only complaint with the medication is that it's painful when he gets the injection and that's every six months." In further support of the circuit court's findings, Bjerregaard testified that Banks is "able to discuss the medication and its uses" but "has no insight," believes he has no mental illness and therefore no need for any medication, and he would stop taking the medication as soon as possible. Banks asserts that Bjerregaard did not say "*when* and *how*" his medication conversation with Banks had occurred, but Bjerregaard did make this clear, as he stated at the start of his

testimony that he was testifying with regard to his in-person interaction with Banks on April 29, 2024.

¶31 As he similarly claimed in connection with his prior recommitment, *C.B.*, No. 2023AP2018-FT, ¶33, Banks states that Bjerregaard's explanation of the disadvantages to Banks was "woefully insufficient" because it did not include additional side effects purportedly associated with Invega Hafyera, Risperdal and Seroquel. Related to Invega Hafyera, Banks refers us to a website for the drug manufacturer that provides a laundry list of potential side effects. For Risperdal and Seroquel, he directs us to a Wisconsin Department of Health Services (DHS) form that lists various potential side effects.

¶32 To begin, Banks' complaint in this regard goes nowhere as he raises it for the first time on appeal. *See Brooks v. Hayes*, 133 Wis. 2d 228, 241, 395 N.W.2d 167 (1986) ("[We] will not consider arguments raised for the first time on appeal."). Banks could have, but did not, argue these points to the circuit court at the final hearing—particularly in light of the fact that our March 20, 2024 opinion, issued two months before the May 17, 2024 hearing underpinning the instant orders, rejected this very argument in part because he failed to raise it before the circuit court. *See C.B.*, No. 2023AP2018-FT, ¶33. Moreover, Banks directs us to no legal support and develops no legal argument for his apparent contention that a doctor's explanation of disadvantages—or advantages or alternatives for that matter—related to medications is legally insufficient if it does not address every possible side effect identified by a drug company, DHS, or some other source a committee might refer a court to.

¶33 Somewhat relatedly, Banks also complains that as to alternatives, Bjerregaard testified to only explaining to Banks alternatives of "other"

antipsychotics, and not discussing "[c]ounseling or other forms of therapy." First, we do not consider this argument either, as it is insufficiently developed—only two sentences address it, *see Clean Wisconsin, Inc. v. PSC*, 2005 WI 93, ¶180 n.40, 282 Wis. 2d 250, 700 N.W.2d 768 ("We will not address undeveloped arguments.")—and Banks provides no legal support for his apparent position that a discussion of "[c]ounseling or other forms of therapy" is required for a sufficient explanation of alternatives. Moreover, he also raises this argument for the first time on appeal and therefore has forfeited it as well. It would have taken little for Banks to question Bjerregaard about this at the hearing or raise it in argument to the circuit court to contend the County had not met its burden, but he did neither. As for sufficiency of the evidence, Bjerregaard testified that he explained to Banks that "other antipsychotics" were the "alternatives to accepting the recommended medication[s]" he is on, and that is sufficient. *See* WIS. STAT. § 51.61(1)(g)4. Additionally, because Banks did not raise this issue during the final hearing, there is no evidence in the record to suggest there were any other realistic treatment alternatives for Banks, especially in light of his complete and consistent denial that he even has a mental illness.

¶34 In asserting that Bjerregaard's explanation to Banks was insufficient, Banks directs us to our recent decision in *State v. J.D.B.*, 2024 WI App 61, ___ Wis. 2d ___, 13 N.W.3d 525. But our determination in that case that the doctor's explanations to J.D.B. of the advantages of, disadvantages of, and alternatives to medications were inadequate was largely driven by "our conclusion that Jared's treatment plan [to restore him to competency for trial on a criminal charge] was not adequately individualized to him." *Id.*, ¶71. There is no such circumstance here. Banks further points to our statements in *J.D.B.* that it was the doctor's "responsibility to explain how he probed the issue of why Jared did not believe he

needed medication. Probing this issue was necessary for the circuit court to determine if Jared's lack of understanding was 'because of mental illness' as required by the statute and not some other cause." *Id.*, ¶70. Banks claims the record here does not show sufficient "probing"; however, Bjerregaard and Townsend both made abundantly clear "why [Banks] d[oes] not believe he need[s] medication," testifying that it is because he does not believe he has a mental illness, and that Banks directly and continuously restates this position. Moreover, Townsend testified that this has been Banks' position since his commitment began in 2015. And as to whether Banks' inability to apply an understanding was "because of mental illness," Bjerregaard made clear in both his testimony and his report that the "cause" of this inability was Banks' "mental illness." No additional probing was needed here.

Hearsay

¶35 Banks claims the commitment order should be reversed if for no other reason than the circuit court permitted Townsend to present hearsay testimony, over Banks' objection, related to Banks' underlying 2014 conduct that led to his initial commitment; specifically, that she was allowed to testify that Banks' original commitment was because he "had stolen the vehicle and when police tried to stop him, he drove into oncoming traffic." We need not decide if the court erred, because even if it did, such error was harmless.

¶36 In his testimony, Bjerregaard agreed that he "discuss[ed] with [Banks] the circumstances that led to the original commitment," and Bjerregaard immediately thereafter testified that Banks "recalls being accused of speeding and driving into oncoming traffic in a car that he had stolen. And that the police fought him and beat him up, brought [him] to the ER and then to jail." When

17

asked if Banks "mention[ed] … what occurred when the police tried to apprehend him," Bjerregaard responded, "[Y]eah, he recalls that he thought he could elude them, so he sped up and tried to elude the police and hide from them." When testifying about his concern that Banks would be dangerous if he stopped taking medication, Bjerregaard testified to his belief that Banks "will … engage in dangerous behavior again. Possibly stealing another car."

¶37 Additionally, Bjerregaard's report indicates Banks' dangerous behavior was "[d]angerous driving eluding police [and] travelling at high speeds possibly into oncoming traffic when off medicine," and includes Bjerregaard's notations of "[h]istory of dangerous driving" and a "[h]istory of driving into oncoming traffic." The report states that Banks recalled to Bjerregaard "police 'saying I drove into oncoming traffic—I did run from the police but they caught me [and] handcuffed me.[']" The circuit court had no concerns regarding Bjerregaard's credibility, and Bjerregaard stated essentially the same factual background of Banks' dangerous driving conduct that Townsend testified to. Thus, Townsend's testimony added nothing consequential in this regard— Bjerregaard explained that the underlying allegations of dangerousness by Banks in 2014 related to him stealing a car, attempting to elude police through a high speed chase, and driving into oncoming traffic.

¶38 Further, in our March 20, 2024 decision, we noted that in discussing Banks' 2014 driving behavior at the final hearing related to that 2024 decision, the circuit court—the same judge presiding as at the final hearing in the instant case— stated that Banks' 2014 "[d]riving a vehicle, fleeing from police … puts not only [Banks] in danger but also everybody in the community that happens to be on the road in the area where somebody is fleeing" and thus was "extremely dangerous" conduct. *C.B.*, No. 2023AP2018-FT, ¶22 (alterations in original). We added that

"[e]ngaging in a high speed chase with police is unquestionably dangerous conduct that places Banks and others in danger." *Id.* Thus, whether Banks actually drove into oncoming traffic was not a fact necessary for the circuit court's, or our, conclusion that Banks' 2014 driving conduct was dangerous.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.

19